IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

UNITED STATES OF AMERICA,    )
                             )        No. 2:22-cr-00640-DCN-1
vs.                          )
                             )        **ORDER**
JEREMY ALLEN HUGHES,         )
                             )
          Defendant.         )
_____)

The following matter is before the court on defendant Jeremy Allen Hughes's

("Hughes") motion to dismiss Count 1 of the indictment, ECF No. 39.  For the reasons

set forth below, the court denies the motion.

## I.  BACKGROUND

The facts underlying the instant prosecution arise from a report that on November

23, 2021, Hughes entered a business wearing tactical clothing and a shirt marked "Police

US Marshals" while carrying a shotgun and holstering pistols with extra magazines.  ECF

No. 40 at 1–2.  Hughes identified himself as "Brian Williams with the U.S. Marshals" to

employees and claimed he was hunting a fugitive.  Id. at 2.  On December 1, 2021, the

United States Marshal Service ("USMS") and Berkeley County Sheriff's Office

("BCSO") located Hughes and conducted a traffic stop.  Id.  Officers arrested Hughes for

impersonating a law enforcement officer and searched him and his vehicle, ultimately

finding 2.9 grams of crystal meth, four guns, clothing with a "Police US Marshal"

insignia, zip ties, and loose ammunition throughout the vehicle.  Id.  Officers then

obtained a search warrant for Hughes's residence and located an additional three guns

and a variety of loose ammunition.  Id.  Investigators subsequently determined Hughes

was federally prohibited from possessing a firearm due to a January 15, 2020 conviction

1

for domestic violence second degree in violation of S.C. Code Ann. § 16-25-20(C).  Id.

This prosecution followed.

On July 13, 2022, the grand jury returned a two-count indictment against Hughes.

ECF Nos. 1, 3.  Count 1 charges that on December 1, 2021, having previously been

convicted of a misdemeanor crime of domestic violation and knowing that he had been

convicted of such a crime, Hughes knowingly possessed firearms and ammunition[1] in

violation of 18 U.S.C. §§ 922(g)(9), 924(a)(2), and 924(e).  ECF No. 1 at 1.  Count 2

charges that Hughes falsely assumed and pretended to be a Deputy Marshal of the USMS

from at least November 23, 2021, up until the date of the indictment, and that Hughes

falsely stated he was a Deputy Marshal to engage in locating and apprehending a fugitive

in violation of 18 U.S.C. § 912.  Id. at 2.  Relevant to the instant motion, Hughes was

convicted of domestic violence in the second degree on August 11, 2018, for which he

was sentenced for three years which was suspended upon two years' probation.[2]  ECF

No. 13 ¶ 6.

---

[1] Specifically, Hughes possessed at least seven different firearms and ammunition, including: (1) Taurus, model G2C, 9mm pistol; (2) Savage, model 110, .30-06 rifle with magazine; (3) Remington, model 870, 12-gauge shotgun; (4) Savage Axis 6.5 Creedmore rifle with magazine; (5) Tristar Arms, model Raptor, 20-gauge shotgun; (6) Legion USA SAIGA 12-gauge shotgun; and (7) Palmetto State Armory Pa-15 .223 caliber assault rifle with magazine.  ECF No. 1 at 3–4.

[2] Hughes does not challenge his prior misdemeanor conviction for domestic violence second degree in violation of S.C. Code Ann. § 16-25-20(C), nor does he challenge that it puts him within the scope of the regulations imposed by 18 U.S.C. § 922(g)(9).  Hughes confirmed as much at the hearing before the court.  ECF No. 52. Rather, Hughes challenges the constitutionality of 18 U.S.C. § 922(g)(9) as applied to any defendant.  See ECF No. 39 at 1–2.  Thus, the court does not analyze either Hughes's underlying conviction or whether it falls within the scope of § 922(g)(9)–instead, the court follows the parties' lead and assumes it does.  See Harley v. Wilkinson, 988 F.3d 766, 778 n.6 (4th Cir. 2021) (Richardson, J., dissenting), abrogated by N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111 (2022) (explaining that since the defendant did not argue that the nature of his previous domestic violence convictions mattered to his

On December 21, 2022, Hughes filed a motion to dismiss Count 1 of the indictment. ECF No. 39. On January 19, 2023, the United States of America (the "government") responded in opposition. ECF No. 41. Hughes did not reply to the government's response in opposition and the time to do so has since expired. On May 16, 2023, the court held a hearing on this motion. ECF No. 52. On June 7, 2023, Hughes filed a reply with notice of new authority. ECF No. 53. As such, the matter is fully briefed and is now ripe for review.

## II.  STANDARD

### A.  Fed. R. Crim. P. 12(b)(3)

The court assumes that this motion is made pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure, which sets forth certain defects in the indictment that can be brought before the court on a pretrial motion.[3] Fed. R. Crim. P. (12)(b)(3). Pursuant to Fed. R. Crim. P. 12(b)(3)(B), the district court may, at any time during the pendency of a case, hear a defendant's claim that an indictment fails to state an offense or is otherwise defective. See In re Civil Rights Cases, 109 U.S. 3, 8–9 (1883). An indictment is defective if it charges a violation of an unconstitutional statute. See United States v. Thomas, 367 F.3d 194, 197 (4th Cir. 2004). Upon a finding that an indictment is defective, the district court must dismiss the indictment.

---

challenge to § 922(g)(9), the court did not address the specifics of his prior conduct in rejecting his claims).

[3] Hughes states that the motion is brought "pursuant to Rule 12 of the Federal Rules of Criminal Procedure." ECF No. 39 at 1. No specific provision is cited, thus requiring the court to presume, based on the substance of the motion, that Hughes brings the motion pursuant to Fed. R. Crim. P. 12(b)(3), which governs motions that must be made before trial and includes alleging that there was "a defect in the indictment or information, including . . . failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v).

**B.  Second Amendment**

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  In New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111 (2022), the Supreme Court clarified the appropriate standard for analyzing Second Amendment claims.  The Supreme Court held that lower courts had been incorrect in reading precedent to require a means-end analysis in evaluating Second Amendment claims.  Id. at 2129.  Instead, the Court explained that District of Columbia v. Heller, 554 U.S. 570 (2008), held, "on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms" for self-defense.  Id. at 2127 (quoting Heller, 554 U.S. at 595).  Further, the Supreme Court emphasized that "Heller and McDonald [v. City of Chicago, 561 U.S. 742 (2010),] expressly rejected the application of any" means-end scrutiny because "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon."  Id. at 2129 (quoting Heller, 554 U.S. at 634; see also McDonald, 561 U.S. at 790–91).  In place of a means-end analysis, then, the Supreme Court articulated the following standard for considering Second Amendment claims:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

Id. at 2129–30 (quoting Konigsberg v. State Bar of Cal., 366 U.S. 36, 50 n.10 (1961)).

In applying <u>Bruen</u>'s standard, courts must first address the threshold question of whether the Second Amendment's plain text protects the conduct that is being regulated. <u>Id.</u> at 2126, 2134.  If it does, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  <u>Id.</u> at 2127.  This requires courts to "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."  <u>Id.</u> at 2131.  Because "Constitutional rights are enshrined with the scope they were understood to have <u>when the people adopted them</u>," <u>id.</u> at 2136 (quoting <u>Heller</u>, 554 U.S. at 634–35) (emphasis in original), the Second Amendment's "meaning is fixed according to the understandings of those who ratified it."  <u>Id.</u> at 2132.  Thus, in assessing "unprecedented societal concerns or dramatic technological changes" that could not have been anticipated by the Founders, "the historical inquiry that courts must conduct will often involve . . . determining whether a historical regulation is a proper analogue[4] for a distinctly modern firearm regulation."  <u>Id.</u> at 2132.

However, the Court noted that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check."  <u>Id.</u> at 2133.  Instead, "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin."  <u>Id.</u>  "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."  <u>Id.</u>

---

[4] Google says that "'analog' is standard in American English, while 'analogue' is standard in British English."  Since the Supreme Court opts for "analogue" and it "grades my papers," this court will use "analogue."

5

## III.  DISCUSSION

Hughes moves to dismiss Count 1 of the indictment, arguing that the law under which it is charged, 18 U.S.C. § 922(g)(9),[5] is facially unconstitutional because it violates Hughes's right to keep and bear arms as protected by the Second Amendment of the United States Constitution.  ECF No. 39 at 1 (citing U.S. Const. amend. II).  Hughes provides a two-page filing[6] which primarily cites Bruen, 142 S. Ct. 2111 (2022), to explain that the Second Amendment framework enunciated in that decision requires the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation," and the government has purportedly not met that standard regarding the regulation of firearm possession due to domestic violence.  ECF No. 39 at 2 (quoting Bruen, 142 S. Ct. at 2126).  As such, Hughes argues that Count 1 of the indictment should be dismissed.[7]

---

[5] "It shall be unlawful for any person[,] who has been convicted in any court of a misdemeanor crime of domestic violence[,] to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  18 U.S.C. § 922(g)(9).  The definition of "misdemeanor crime of domestic violence" applied by § 922(g)(9) narrowly defines the category of prohibited individuals by requiring that the underlying conviction have "as an element, the use or attempted use of physical force."  Id. § 921(a)(33)(A)(ii).  The definition of a "misdemeanor crime of domestic violence" also requires that the conviction have been secured through a jury trial with counsel, or after an intelligent waiver of a defendant's constitutional rights.  Id. § 921(a)(33)(B).  And the statute provides that the firearm prohibition no longer applies, with some exceptions, if the domestic violence misdemeanor conviction "has been expunged or set aside" or if "the person has been pardoned or has had civil rights restored."  Id. § 921(a)(33)(B)(ii).

[6] One might ask how a 2-page motion and brief could result in a 31-page order, but that is a question for another day.

[7] Though Hughes does not directly explain the impact his argument has on the other two statutory provisions raised in Count 1, 18 U.S.C. §§ 924(a)(2), and 924(e), the court concludes that violation of those offenses relies fundamentally on charging Hughes with violation of 18 U.S.C. § 922(g)(9).

In response, the government explains that "the Supreme Court has repeatedly recognized . . . the propriety of disarming prior criminals because the Second Amendment only protects the right of 'law-abiding, responsible' citizens to possess guns." ECF No. 41 at 1. The government argues that the Supreme Court's decisions in Heller and Bruen do not invalidate § 922(g)(9), nor did Bruen entirely abrogate the Fourth Circuit's post-Heller Second Amendment precedent. Id. at 5. Rather, those Supreme Court decisions emphasized that the Second Amendment protections only apply to law-abiding citizens, which excludes those citizens convicted of domestic violence. See id. Moreover, the government emphasizes that there is a longstanding historical tradition in the United States of disarming criminals and similarly dangerous individuals. Id. at 8–10. In particular, the government provides that there is a long history of similar protections—notably the common-law surety process—that were available to protect victims of domestic violence, which the government emphasizes is a clear analogue to § 922(g)(9). Id. at 11. The court begins by reviewing other courts' analyses of the constitutionality of § 922(g)(9), before examining the parties' arguments under the two-step analysis of Bruen. See 142 S. Ct. at 2129–30.

## A. Analogous Decisions from Other Courts

The court starts by examining the decisions from other courts which considered the impact of Bruen on prosecutions brought pursuant to 18 U.S.C. § 922(g)(9).

To date, the court has identified three district courts within the Fourth Circuit which have analyzed the impact of Bruen on § 922(g)(9)—one of which is currently on appeal to the Fourth Circuit. United States v. Nutter, 624 F. Supp. 3d 636, 640 (S.D.W. Va. 2022), on appeal No. 22-4541, (4th Cir. 2023); United States v. Doty, 2022 WL

17492260 (N.D. W. Va. Sept. 9, 2022); United States v. Anderson, 2022 WL 10208253 (W.D. Va. Oct. 17, 2022).  In Nutter, the district court denied the defendant's motion to dismiss, including, inter alia, his § 922(g)(9) charge by providing context as to who was included in the "well-regulated militia," and what class of dangerous persons was forbidden from gun ownership at the founding.  See generally 624 F. Supp. 3d 636.  That court generally considered the regulations in place at the time of the Second Amendment's enactment, and other cases similarly examining the historical evidence, to conclude that the text of the Second Amendment guarantees the right to keep and bear arms to ordinary, law-abiding citizens concerned with self-defense.  Id. at 643.  It explained that "[c]ommon sense tells us that the public understanding of the Second Amendment at the time of its enactment, which allowed for disarmament of Blacks and Native Americans based upon their perceived threat, would have accepted disarmament of people convicted of misdemeanor crimes of domestic violence, a group found by the legislative branch to present a danger of misusing firearms."  Id. at 645.  The court in Nutter did not separately evaluate each step of Bruen but rather considered the text and historical evidence in concert to reach its conclusion.  See id. at 642–45.

Similarly, in Doty the court relied on the analysis in Nutter to dismiss the defendant's motion to withdraw his guilty plea and to deny the motion to dismiss the one-count indictment brought pursuant to § 922(g)(9).  Doty, 2022 WL 17492260, at *3.  The court explained that "[n]othing in the historical record suggests a popular understanding of the Second Amendment at the time of the founding that extended to preserving gun rights for groups who pose a particular risk of using firearms against innocent people."  Id. (quoting Nutter, 624 F. Supp. 3d at 645).  By contrast, in Anderson, the court rested

its decision on an analysis of the second prong of <u>Bruen</u>, finding that "the government []
provided sufficient evidence of historical tradition, that, by analogy, applies to uphold
§ 922(g)(9)."  2022 WL 10208253, at *1.  Together, the sister courts within the Fourth
Circuit have squarely considered the question raised here and found § 922(g)(9) to be
constitutional, though <u>Nutter</u> and <u>Doty</u> appear to reach their conclusion by relying on
<u>Bruen</u>'s first and second prong in aggregate, and <u>Anderson</u> reached it on <u>Bruen</u>'s second
prong.  To be sure, this remains a novel question; thus, the court expands its review to
consider how courts in other circuits have resolved the issue.

Some courts outside of the Fourth Circuit have similarly extended the analysis of
historical laws to defendants convicted of misdemeanor crimes of domestic violence who
are subsequently charged with violating 18 U.S.C. § 922(g)(9).  <u>See, e.g.</u>, <u>United States v.
Jackson</u>, 622 F. Supp. 3d 1063, 1067 (W.D. Okla. 2022) (holding that § 922(g)(9) was
not unconstitutional even though <u>Bruen</u>'s first-prong analysis showed convicted domestic
violence misdemeanors were covered by the Second Amendment because <u>Bruen</u>'s second
prong was met from "the government's reliance on general historical tradition," including
restrictions historically imposed on felons, and because adopting an analogy to surety
laws discussed in <u>Bruen</u> "[wa]s sufficient to satisfy its burden"); <u>United States v. Padgett</u>,
2023 WL 2986935, at *5–6 (D. Alaska Apr. 18, 2023) (finding that § 922(g)(9) was
constitutional based on the second prong of <u>Bruen</u> and declining to resolve whether the
plain text of the Second Amendment reaches domestic violence misdemeanants).[8]

---

[8] As far as the court can tell, most courts which have considered challenges to
§ 922(g)(9) have upheld it as constitutional, though for varying reasons.  <u>See, e.g.</u>, <u>United
States v. Porter</u>, 2023 WL 2527878, at *2–4 (W.D. La. Mar. 14, 2023) (finding
§ 922(g)(9) constitutional under both prongs of <u>Bruen</u>); <u>United States v. Smith</u>, 2023 WL
2215779, at *3–4 (E.D. Mich. Feb. 24, 2023) (same); <u>United States v. Bernard</u>, 2022 WL

However, other courts that have considered other subparts of § 922(g) have found them to be unconstitutional and unsupported by historical evidence in the wake of Bruen.  See, e.g., United States v. Rahimi, 61 F.4th 443, 454–56 (5th Cir. 2023) (holding § 922(g)(8)—which prohibits the possession of firearms by persons subject to a civil domestic violence order—unconstitutional because possession of a firearm "easily falls within the purview of the Second Amendment" and because the government's proffered "historical analogues" were not relevantly-similar precursors to § 922(g)(8)).  Thus, there is no clear consensus nationwide among the courts of the impact of Bruen on § 922(g)(9), though most courts have concluded that the statute is constitutional.  Keeping those decisions in mind, the court turns to the two prongs of Bruen.

## B.  First Prong of Bruen

To start, the court must determine whether the Second Amendment's plain text protects the conduct that is being regulated.  Bruen, 142 S. Ct. at 2126, 2134.  To follow Hughes's logic, the court must first find that a person convicted of misdemeanor domestic violence retains his right to keep and bear arms under the plain language of the Second Amendment.  A facial challenge to a legislative act requires the challenger to "establish that no set of circumstances exists under which the Act would be valid."

---

17416681, at *8 (N.D. Iowa Dec. 5, 2022) (same); Jackson, 622 F. Supp. 3d at 1067 (finding § 922(g)(9) constitutional under the second prong but not the first prong of Bruen); United States v. Bruner, 2023 WL 2653392, at *2 (W.D. Okla. Mar. 27, 2023) (same); United States v. Gleaves, 2023 WL 1791866, at *4 (M.D. Tenn. Feb. 6, 2023) (finding that precedent from Bruen and the Sixth Circuit requires the court uphold the constitutionality of § 922(g)(9)); United States v. Farley, 2023 WL 1825066, at *3 (C.D. Ill. Feb. 8, 2023) (same, referencing precedent from the Seventh Circuit); United States v. Hammond, 2023 WL 2319321, at *7 (S.D. Iowa Feb. 15, 2023) (same, referencing precedent from the Eighth Circuit; see also United States v. Hoeft, 2023 WL 2586030, at *6–7 (D.S.D. Mar. 21, 2023) (denying as-applied challenge to § 922(g)(9) as premature).

United States v. Salerno, 481 U.S. 739, 745 (1987).  Thus, to meet the requirements of

the first prong of Bruen, Hughes bears the burden of showing that under no set of

circumstances is the Act valid.[9]  See id.  The government argues that Bruen only provides

Second Amendment protections to "law-abiding citizens," which does not include

convicted domestic violence misdemeanants.  See ECF No. 41 at 5–8.  As such, to find

that Hughes meets his burden under the first prong, the court must find that the plain

language of the Second Amendment applies to persons similarly situated to Hughes—

namely, domestic violence misdemeanants.

    The court starts by analyzing language from the Supreme Court which suggests

that a similar statutory provision prohibiting gun ownership by felons, 18 U.S.C.

§ 922(g)(1), is constitutional under the plain language of the Second Amendment.  To

begin, the Bruen Court expressly stated that its overarching holding was "consistent with

Heller and McDonald."  Bruen, 142 S. Ct. at 2122.  Heller in turn emphasized in dicta

that "nothing in [the Court's] opinion should be taken to cast doubt on longstanding

prohibitions on the possession of firearms by felons[, i.e., § 922(g)(1)]."  554 U.S. at 626;

see also Bruen, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).[10]  That language

---

[9] The government made this argument at the hearing and Hughes agreed that he
must meet the burden for the first prong, which he argued was easily met.  ECF No. 52.

[10] The Supreme Court identified a non-exclusive illustrative list of constitutionally
permissible restrictions on the Second Amendment.  See Heller, 554 U.S. at 626–27 n.26.
Specifically, the Court explained that "nothing in our opinion should be taken to cast
doubt on longstanding prohibitions on the possession of firearms by felons[, § 922(g)(1),]
and the mentally ill, [§ 922(g)(4),]."  Id. at 626–27.  Thus, in Heller the Court identified
certain subsections under § 922(g) as presumptively lawful but made no mention of
domestic violence misdemeanants.  See id.  While Bruen necessarily abrogated cases
analyzing the domestic-violence statute to the extent they employed means-end scrutiny,
Bruen does not question the "longstanding regulatory measures" declared presumptively
lawful in Heller and McDonald.  Importantly, the Bruen Court characterized its decision
as "ma[king] the constitutional standard endorsed in Heller more explicit,"—not

establishes compelling authority finding § 922(g)(1) constitutional even though it expressly prohibits a class of people—felons—from keeping and bearing arms. As one court described it, "<u>Bruen</u> clarified and 'reiterated[,]' rather than modified, the constitutional ruling in <u>Heller</u>, in the face of lower court rulings that failed to comport with its intended holding," which led that court to uphold §922(g)(1) in the wake of <u>Bruen</u>. <u>United States v. Ingram</u>, 623 F. Supp. 3d 660, 663 (D.S.C. 2022).

In other words, the Second Amendment guarantees "the right of the people to keep and bear Arms," U.S. Const. amend. II, but "[a] plain reading of the text demonstrates that 'the people' remains limited to those within the political community and not those classified as felons." <u>See</u> <u>United States v. Riley</u>, 2022 WL 7610264, at *10 (E.D. Va. Oct. 13, 2022) (upholding § 922(g)(1)); <u>United States v. Finney</u>, 2023 WL 2696203, at *1 (E.D. Va. Mar. 29, 2023) (same). As the court in <u>Riley</u> explained:

> Considering <u>Bruen</u>'s constant qualification that its analysis operates within the context of "law-abiding, responsible citizens," 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156, the dicta in <u>Heller</u> and <u>McDonald</u> still

---

abrogating or overturning it. <u>Bruen</u>, 142 S. Ct. at 2134. In fact, two of the concurring opinions in <u>Bruen</u> emphasized the presumptively lawful regulations referenced in <u>Heller</u> and <u>McDonald</u>. <u>See</u> <u>id.</u> at 2162 (Kavanaugh, J., concurring) (reiterating language from <u>Heller</u> and <u>McDonald</u> about "longstanding prohibitions on the possession of firearms by felons and the mentally ill"); <u>id.</u> at 2157 (Alito, J., concurring) (clarifying that the Court's holding did not "disturb[] anything that we said in <u>Heller</u> or <u>McDonald v. Chicago</u> . . . about restrictions that may be imposed on the possession or carrying of guns"). The dissent also viewed the majority opinion the same way, stating that it "understand[s] the Court's opinion today to cast no doubt on" <u>Heller</u>'s treatment of laws prohibiting firearm possession by felons and the mentally ill. <u>Id.</u> at 2189 (Breyer, J., dissenting). The Supreme Court's repeated emphasis on restraint and desire to avoid disturbing "presumptively lawful" regulations counsels lower courts to exercise the same caution to not apply the holdings of <u>Bruen</u>, <u>McDonald</u>, and <u>Heller</u> any further than the Court itself did. Moreover, although this court is "not bound by dicta or separate opinions of the Supreme Court," <u>Myers v. Loudoun Cnty. Pub. Sch.</u>, 418 F.3d 395, 406 (4th Cir. 2005), it should "give great weight to Supreme Court dicta," <u>N.L.R.B. v. Bluefield Hosp. Co., LLC</u>, 821 F.3d 534, 541 n.6 (4th Cir. 2016).

define the outer bounds of "the people" who may enjoy an uninhibited right
to bear arms under the Second and Fourteenth Amendments.

Riley, 2022 WL 7610264, at *10; see also Ingram, 623 F. Supp. 3d at 664 ("[The dicta in

Heller], coupled with the majority's focus in Bruen on the Second Amendment rights of

'law-abiding citizens' throughout the opinion convinces this Court that the Supreme

Court would conclude that [§ 922(g)(1)] fail[s] to infringe on any Second Amendment

rights."); Hamilton v. Pallozzi, 848 F.3d 614, 626 (4th Cir. 2017) ("[W]e simply hold that

conviction of a felony necessarily removes one from the class of law-abiding, responsible

citizens for the purposes of the Second Amendment[.]").  Thus, courts that have

considered the constitutionality of § 922(g)(1) in the wake of Bruen have

overwhelmingly found the statute—which prohibits convicted felons from possessing

firearms—constitutional.[11]

---

[11] For example, in the Fourth Circuit alone, at least twenty district courts have
found § 922(g)(1) constitutional since Bruen was decided: United States v. Robinson-
Davis, 2023 WL 2495805 (W.D. Va. Mar. 14, 2023); United States v. Jackson, 2023 WL
2499856 (D. Md. Mar. 13, 2023); United States v. Tucker, 2023 WL 205300 (S.D. W.
Va. Jan. 17, 2023); United States v. Coleman, 2023 WL 122401 (N.D. W. Va. Jan. 6,
2023); United States v. Medrano, 2023 WL 122650 (N.D. W. Va. Jan. 6, 2023); United
States v. Dawson, 2022 WL 17839807 (W.D.N.C. Dec. 21, 2022); United States v.
Marique, 2022 WL 17822443 (D. Md. Dec. 20, 2022); United States v. Tallion, 2022
WL 17619254 (D. Md. Dec. 13, 2022); United States v. Spencer, 2022 WL 17585782 (E.D.
Va. Dec. 12, 2022); United States v. Wagoner, 2022 WL 17418000 (W.D. Va. Dec. 5,
2022); United States v. Burton, 2022 WL 16541139 (D.S.C. Oct. 28, 2022); United States
v. Grant, 2022 WL 16541138 (D.S.C. Oct. 28, 2022); United States v. Snead, 2022 WL
16534278 (W.D. Va. Oct. 28, 2022); United States v. Anderson, 2022 WL 10208253
(W.D. Va. Oct. 17, 2022); Riley, 2022 WL 7610264; United States v. Price, 2022 WL
6968457 (S.D.W. Va. Oct. 12, 2022); United States v. Daniels, 2022 WL 5027574
(W.D.N.C. Oct. 4, 2022); Doty, 2022 WL 17492260; Nutter, 624 F. Supp. 3d 636 (S.D.
W. Va. 2022); Ingram, 623 F. Supp. 3d 660.
        At least three circuit courts have reached the issue on varying procedural postures
and challenges to § 922(g)(1).  The Eighth Circuit considered the constitutionality of
§ 922(g)(1) under Bruen in the context of an as-applied challenge and found that "there is
no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)."
United States v. Jackson, 69 F.4th 495, 502 (8th Cir. 2023).  The Seventh Circuit
considered the constitutionality of § 922(g)(1) under Bruen (albeit in the context of a

Moreover, courts that have considered other references to "the people" in the constitution have concluded that "the people" are those who are considered part of the political community—and convicted felons have traditionally been excluded from the political community.  See Riley, 2022 WL 7610264, at *11; United States v. Collette, 2022 WL 4476790, at *5–6 (W.D. Tex. Sept. 25, 2022) ("[A]t the time of the Second Amendment's ratification, the right to vote, hold public office, or serve on a jury were thought of as equal to keeping and bearing arms because all were so-called 'political rights.'"); but see United States v. Bernard, 2022 WL 17416681, at *7 (N.D. Iowa Dec. 5, 2022) (internal citation omitted) ("The Court rejects the government's argument that the Second Amendment applies only to law-abiding citizens as a textual matter . . . the plain reading of the Second Amendment covers [the] defendant who is a person under the Constitution.").  Therefore, some courts have found it to be illogical to find that the

---

motion to withdraw filed by appointed counsel) and found that "it would be frivolous to argue that section 922(g)(1) is unconstitutional [as applied to a person convicted of a violent felony.]"  United States v. Gonzalez, 2022 WL 4376074 (7th Cir. Sept. 22, 2022). However, a recent decision from the Seventh Circuit indicates that the court's prior decision in Gonzalez is not binding on this issue because the court in Atkinson v. Garland remanded the case to the district court "for a proper, fulsome analysis of the historical tradition supporting § 922(g)(1)."  2023 WL 4071542, at *3 (7th Cir. June 20, 2023).  In contrast, a panel of the Third Circuit rejected an as-applied challenge to section 922(g)(1) with respect to a person convicted of a non-violent felony, see Range v. Att'y Gen. United States, 53 F.4th 262 (3d Cir. 2022), which the Third Circuit later voted to vacate and rehear en banc, Range v. Att'y Gen. United States of Am., 56 F.4th 992 (3d Cir. 2023).  The court issued a divided en banc decision on June 6, 2023, in which eleven judges found that 18 U.S.C. § 922(g)(1) was unconstitutional under the Second Amendment as applied to the defendant because he fell within "the people" under the Second Amendment.  Of the eleven judges, nine also found that the government failed to carry its burden to show the long history of firearm regulation of felons; four judges dissented.  Range v. Att'y Gen. United States of Am., 69 F.4th 96, 97–98 (3d Cir. 2023) (en banc).  That decision, rather than illustrating uniformity, shows that courts are sharply divided over this issue as that decision included the opinion of the court, two concurrences, and three dissents.  Id.

Founders considered the right to bear and keep arms less prone to restriction than the right to cast a ballot when those rights were historically closely knit. Id.; see, e.g., Bruen, 142 S. Ct. at 2131 (applying First Amendment principles to the Second Amendment); Harlan Reynolds, A Critical Guide to the Second Amendment, 62 Tenn. L. Rev. 461, 480–81 (1995) ("[T]he franchise and the right to arms were 'intimately linked' in the minds of the Framers and of prior and subsequent republican thinkers."); Joseph Blocher, Categoricalism and Balancing in First and Second Amendment Analysis, 84 N.Y.U. L. Rev. 375, 379 (2009) ("[T]he First and Second Amendments have often been considered close cousins."). The consensus indicates that the first prong of Bruen as applied to § 922(g)(1) shows that the statute is constitutional—meaning, felons are excluded from "the people" under the plain text of the Second Amendment.

However, it is unclear how longstanding constitutional federal statutes governing firearm possession by convicted felons impacts laws governing firearm possession by convicted domestic violence misdemeanants. Certainly, prior to Bruen, some courts found that § 922(g)(9) was presumptively lawful by analogy to § 922(g)(1). See, e.g., United States v. Smith, 742 F. Supp. 2d 855, 862 (S.D. W. Va. 2010); United States v. Holbrook, 613 F. Supp. 2d 745, 776 (W.D. Va. 2009). This accords with prior decisions binding on this court, which noted that § 922(g)(9) was enacted to "close a dangerous loophole," left by the fact that many domestic violence offenses failed to qualify under the felon in possession prohibition in § 922(g)(1). Harley v. Wilkinson, 988 F.3d 766, 770 (4th Cir. 2021), abrogated by Bruen, 142 S. Ct. at 2126–27 n.4 (quoting United States v. Castleman, 572 U.S. 157, 159–60 (2014)). Underlying Congress's decision to single out domestic violence misdemeanors are the "sobering" realities that "[d]omestic

15

violence often escalates in severity over time," "the presence of a firearm increases the likelihood that it will escalate to homicide," and "many perpetrators of domestic violence are convicted only of misdemeanors."  Castleman, 572 U.S. at 160; United States v. Staten, 666 F.3d 154, 167 (4th Cir. 2011), abrogated by Bruen, 142 S. Ct. at 2126–27 n.4 (explaining that domestic violence is a serious issue, recidivism rates are high for domestic violence misdemeanants, firearms are often used in connection with domestic violence, and firearms increase the risk of and are often connected to injuries and homicides related to domestic violence).  However, the propriety of such an analogy in the wake of Bruen and precedent from the Fourth Circuit is uncertain.  See, e.g., United States v. Chester, 628 F.3d 673, 679 (4th Cir. 2010), abrogated by Bruen, 142 S. Ct. at 2126–27 & n.4 (rejecting the finding that § 922(g)(9) is presumptively lawful by analogy to § 922(g)(1) because such a conclusion approximates rational basis review).  Rather, it is likely that a more nuanced analysis is required to determine whether convicted domestic violence misdemeanants—who are not felons governed by § 922(g)(1)—enjoy the protections of the Second Amendment under the plain text of the amendment.

To start, the court notes that it is debatable whether persons convicted of misdemeanors may be restricted from firearm ownership to the same extent as persons convicted of felonies.  When discussing the Second Amendment's scope, Heller referred to "law-abiding, responsible citizens."  See 554 U.S. at 635.  Bruen echoed Heller, also referring to "ordinary, law-abiding citizens" throughout the opinion.  See 142 S. Ct. at 2122, 2131, 2133, 2156.  Based on this language, the Fourth Circuit has interpreted the Second Amendment as covering only "law-abiding" citizens.  See United States v. Carpio-Leon, 701 F.3d 974, 975 (4th Cir. 2012) ("[T]he scope of the Second Amendment

16

does not extend to provide protection to illegal aliens, because illegal aliens are not law-abiding members of the political community . . . .").  In Bruen's wake, other district courts in the Fourth Circuit have continued to understand the Supreme Court's reference to "law-abiding" citizens as limiting the scope of the Second Amendment.  See United States v. Medrano, 2023 WL 122650, at *3 (N.D. W. Va. Jan. 6, 2023) (collecting cases); see also United States v. Jackson, 2023 WL 2242873, at *7 (D. Md. Feb. 27, 2023), superseded by 2023 WL 2499856 (D. Md. Mar. 13, 2023) (collecting cases from other circuits).  It begs the question: does the category of "law-abiding" citizens exclude only those who have been convicted of felony crimes, or are persons who are convicted of misdemeanor crimes also excluded from the class of "law-abiding" citizens?  The Southern District of West Virginia referenced the concept of "law-abiding citizens" in rejecting a post-Bruen challenge to the constitutionality of §§ 922(g)(9) and 924(a)(2)—meaning at least one court has found persons convicted of misdemeanor crimes in addition to those convicted of felonies to be outside the scope of "law-abiding citizens." See Nutter, 624 F. Supp. 3d at 644–45 (underscoring the importance of "the Supreme Court's repeated invocation of 'law-abiding citizens' in its recent Second Amendment jurisprudence," and finding support in the historical tradition for laws prohibiting certain categories of persons from possessing firearms in the interest of public safety).

Yet such a conclusion may be foreclosed by Fourth Circuit precedent.  Namely, the Fourth Circuit's decision on rehearing in Chester, which directly considered the constitutionality of § 922(g)(9) in the wake of Heller but prior to Bruen, likely forecloses this court from finding that a domestic violence misdemeanant is excluded from "the people" of the Second Amendment.  See 628 F.3d 673.  Though the analysis did not

follow the exact two-step inquiry set forth in <u>Bruen</u>, the Fourth Circuit analyzed whether

§ 922(g)(9) burdens conduct that comes within the scope of the Second Amendment—

<u>i.e.</u>, whether the possession of a firearm by a domestic violence misdemeanant is

protected by the Second Amendment—which is a similar inquiry to the first step of the

<u>Bruen</u> analysis.  <u>See</u> <u>id.</u> at 680–81; <u>Bruen</u>, 142 S. Ct. at 2127 (determining that the first

step in the predominant circuit court framework was "broadly consistent with <u>Heller</u>,

which demands a test rooted in the Second Amendment's text, as informed by history").

The Fourth Circuit explained that "[§] 922(g)(9), like the felon-dispossession provision

set forth in § 922(g)(1), permanently disarms an entire category of persons."  <u>Id.</u>  Thus,

the court had to determine "whether a person, rather than the person's conduct, is

unprotected by the Second Amendment."  <u>Id.</u>  The court considered the historical record,

including commentary from academics who were divided on the question of the

categorical exclusion of felons from Second Amendment protection,[12] and concluded that

---

[12] The federal provision disarming domestic-violence misdemeanants is of recent vintage, having been enacted in 1996 as part of the Lautenberg Amendment to the Gun Control Act of 1968.  <u>See</u> Pub. L. No. 104–208, § 658, 110 Stat. 3009, 3009–371 to –372 (1996).  By contrast, the federal felon dispossession provision has existed in some form or another since the 1930s, and thus there is a much larger body of scholarly work considering the question of whether felons were originally excluded from the protection afforded by the Second Amendment.  Commentators are nonetheless divided on the question of the categorical exclusion of felons from Second Amendment protection. <u>Compare</u> C. Kevin Marshall, <u>Why Can't Martha Stewart Have a Gun?</u>, 32 Harv. J.L. & Pub. Pol'y 695, 714 (2009) (reviewing founding-era precedents and explaining that "much like the American authorities for a century and a half after the Second Amendment's adoption, the actual English antecedents point against lifetime total disarmament of all 'felons,' but do support lesser limitations"), and Carlton F.W. Larson, <u>Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit</u>, 60 Hastings L.J. 1371, 1376 (2009) (explaining that because state and federal "felon disarmament laws significantly postdate both the Second Amendment and the Fourteenth Amendment[,] [a]n originalist argument that sought to identify 1791 or 1868 analogues to felon disarmament laws would be quite difficult to make"), <u>with</u> Don B. Kates & Clayton E. Cramer, <u>Second Amendment Limitations & Criminological</u>

the court was "certainly not able to say that the Second Amendment, as historically understood, did not apply to persons convicted of domestic violence misdemeanors." Id. at 681.  Consequently, the Fourth Circuit assumed that a person convicted of a domestic violence misdemeanor retained somewhat intact Second Amendment rights and the government's regulation had to be examined under the means-end prong implemented in the wake of Heller.[13]  Id. at 681–82.  Thus, the Fourth Circuit's holding in Chester remains binding law on this court to the extent it survives Bruen and informs the analysis mandated by Bruen (though other courts in this circuit who have considered Bruen's implications have not dealt with the combined holdings of Bruen and Chester).

The court reiterates that under the operative test it must first determine whether the Second Amendment's plain text covers Hughes's conduct.  See Bruen, 142 S. Ct. at 2129–30.  Binding precedent from the Fourth Circuit in Chester leads the court to conclude that Hughes's status as a convicted domestic violence misdemeanant does not clearly bar him from inclusion among "the people" who have a right to bear arms under the Second Amendment.  In plain terms, the court will assume that convicted

---

Considerations, 60 Hastings L.J. 1339, 1360 (2009) ("[T]here is every reason to believe that the Founding Fathers would have deemed persons convicted of any of the common law felonies not to be among 'the [virtuous] people' to whom they were guaranteeing the right to arms."), and Reynolds, supra, at 480 (opining that "felons, children, and the insane were excluded from the right to arms precisely as (and for the same reasons) they were excluded from the franchise").

[13] Thereafter, the Fourth Circuit in Chester reached the second-step—which Bruen's later holding indicated was "one step too many," Bruen, 142 S. Ct. at 2127—and concluded that the defendant's claim was not subject to strict scrutiny because his right was not a "core right identified in Heller—the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense—by virtue of [the defendant's] criminal history as a domestic violence misdemeanant."  Chester, 628 F.3d at 683 (citing Heller, 554 U.S. at 635) (emphasis in original).  The Fourth Circuit remanded the case "to afford the government an opportunity to shoulder its burden and [the defendant] an opportunity to respond."  Id.

misdemeanants likely fall within "the people" contemplated by the Second Amendment and retain their right to bear arms to an extent.  Without definitively ruling on the first prong, the court turns to the second prong.

### C.  Second Prong of Bruen

Even if the court were to find that convicted misdemeanants retained the right to keep and bear arms, the statute may still be constitutional if the court were to find that the regulation at issue "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  Id. at 2127.  This requires the court to "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."  Id. at 2131.  The government puts forth two arguments under this test.[14]  ECF No. 41 at 8–15.  First, the government explains that there is a longstanding historical tradition in the United States of disarming criminals and dangerous individuals.  Id. at 8–10.  Second, the government emphasizes that historical regulations to combat domestic violence in place at the time of this country's founding further support the constitutionality of § 922(g)(9).  Id. at 10–15.

Some courts have suggested that Bruen identified two separate inquiries for the second prong: a distinctively similar standard and a relevantly similar standard.  See, e.g., United States v. Holden, 2022 WL 17103509, at *3 (N.D. Ind. Oct. 31, 2022), rev'd on other grounds, 2023 WL 4039607 (7th Cir. June 16, 2023); but see United States v. Gould, 2023 WL 3295597, at *8–9 (S.D. W. Va. May 5, 2023) (suggesting that the two

---

[14] The government included additional evidence for the two arguments at the hearing which served to supplement its previously filed brief.  See ECF No. 52.  Much of this new evidence also appeared in the government's brief filed in the case on appeal to the Fourth Circuit, United States v. Nutter, No. 22-4541 (4th Cir. 2023) (Dkt. 22).

inquiries are largely coextensive because both allow reasoning by analogy).  If applied, the two standards would establish different inquiries depending on whether the challenged regulation addresses a societal problem that has existed since the founding. First, if the societal problem has existed since the founding and the inquiry is "straightforward," then the court may consider factors that are "distinctly similar," which is a purportedly more rigorous standard.  Those factors that suggest the regulation is unconstitutional include when there is a "lack of a distinctly similar historical regulation addressing the problem," where "earlier generations addressed the societal problem . . . though materially different means," or when failed proposals of analogous regulations were rejected on constitutional grounds.  <u>Bruen</u>, 142 S. Ct. at 2131.  Second and in contrast, the "relevantly similar" inquiry—which is used to evaluate regulations that govern a societal problem that would have been unimaginable at the founding— involves reasoning by analogy in a "more nuanced approach" which addresses new issues.  <u>See id.</u> at 2132.  Namely, a "relevantly similar" analogue requires the government to identify a "well-established and representative historical analogue," which need not be a "historical twin" or a "dead ringer for historical precursors."  <u>Id.</u>  Yet many courts decline to differentiate between the two standards—instead, courts apply historical reasoning by analogy, in part because of the inherent difficulty in finding an identical comparison.[15]  <u>See, e.g.</u>, <u>Gould</u>, 2023 WL 3295597, at *9.  Specifically, courts focus on

---

[15] An exchange between Justice Alito and Justice Scalia in <u>Jones v. United States</u>, 565 U.S. 400 (2012), illustrates this difficulty.  In response to Scalia's reliance on 18th-century legal tradition to assess whether using a GPS device to track a suspect's car comports with the Fourth Amendment, Justice Alito wrote that "it is almost impossible to think of late-18th-century situations that are analogous to" the use of GPS devices.  <u>Id.</u> at 420 (Alito, J., concurring).  He went on to ask, "Is it possible to imagine a case in which a constable secreted himself somewhere in a coach and remained there for a period of time

the fact that "Bruen offers two metrics that make historical and modern firearms regulations similar enough: 'how and why the regulations burden a law-abiding citizen's right to armed self-defense.'"  Range, 69 F.4th at 103 (quoting Bruen, 142 S. Ct. at 2133) (emphasis added).

Thus, the court must first determine what "societal problem" § 922(g)(9) seeks to address to identify how and why the regulation burdens a person's right to armed self-defense.  Neither party explicitly sets forth the "societal problem."[16]  Upon distilling the parties' arguments, the court is confronted with a choice between three different "societal problems": (1) the risk dangerous individuals pose to society; (2) the perils of domestic violence; or (3) the use of guns in domestic violence.  The court follows the Fifth Circuit's lead in Rahimi and finds that "somewhat abstracting the laws' justifications" is "consistent with Bruen's instruction that 'even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional

---

in order to monitor the movements of the coach's owner?"  Id.  Such an analogy would be absurd, and Justice Alito noted as much, saying, "[T]his would have required either a gigantic coach, a very tiny constable, or both—not to mention a constable with incredible fortitude and patience."  Id. at 420 n.3.  A similar exchange between Justices Alito and Scalia arose at oral argument for Brown v. Entertainment Merchants Ass'ns, 131 S. Ct. 2729 (2011), which concerned a First Amendment challenge to restrictions on violent video games, where Justice Alito said, "Well, I think what Justice Scalia wants to know is what James Madison thought about video games."  See also Joseph Blocher & Eric Ruben, Originalism-by-Analogy and Second Amendment Adjudication, 133 Yale L.J. (Forthcoming 2023), electronic copy available at https://ssrn.com/abstract=4408228.

[16] At most, Hughes emphasizes that "there is no historical evidence of laws limiting firearm possession from misdemeanor domestic abusers."  ECF No. 39 at 2.  In contrast, the government emphasizes that it "has long regulated (and limited) firearm possession by criminals and other individuals viewed as dangerous," meaning the "societal problem" refers to individuals dangerous to the community.  ECF No. 41 at 8.  The government goes further and says even if the "societal problem" is domestic violence in particular, there is a "history of seeking to provide some protection for victims of domestic violence."  Id. at 10.

22

muster.'"  Rahimi, 61 F.4th at 460 n.10 (quoting Bruen, 142 S. Ct. at 2133); see also

Joseph Blocher & Eric Ruben, Originalism-by-Analogy and Second Amendment

Adjudication, 133 Yale L.J. at 10 (Forthcoming 2023) ("Adjusting the level of generality

at which the historical inquiry is conducted can help mitigate the risk of anachronism").

Put another way, the court considers why a gun regulation was passed at the time of the

founding, not just whom the statute regulated.  See Blocher & Ruben, supra, at 63

(explaining the relevance of founding-era statutes disarming Black Americans and Native

Americans to modern day statutes disarming domestic abusers because those groups were

perceived as dangerous at the time of the founding).  As such, the court first considers the

government's evidence of historical analogues of regulations that sought to protect

society from dangerous individuals, before considering those regulations in place to

prevent domestic violence at the time of the founding.

### 1.  Disarming Criminals and Dangerous Individuals

Hughes does not address or argue that domestic violence was meaningfully

different from other forms of violence, and instead focuses on the fact that "[t]here is

little historical evidence of law regulating firearm possession due to domestic violence."

ECF No. 39 at 2.  In response, the government emphasizes that there is a longstanding

tradition of disarming criminals and dangerous individuals which should encompass

those persons convicted of domestic violence misdemeanors.  ECF No. 41 at 8.

Construed broadly, all of the regulations included under 18 U.S.C. § 922(g) indicate the

government's regulation of a class of persons perceived to be "dangerous," which is

23

analogous to laws enacted in the early republic.[17]  Thus, under a broad view, § 922(g)(9) is clearly constitutional.

This interpretation is buoyed by the history of the early republic.[18]  As one scholar opined, "[g]un laws are as old as the country; more to the point, the idea of gun laws and regulation is as old as the country."  Robert J. Spitzer, Gun Law History in the United States and Second Amendment Rights, 80 L. & Contemporary Problems 55, 83 (2017) (emphasis in original). Importantly, the majority of the laws passed "reflect the

---

[17] For the laws regarding the disarmament of native people, see, e.g., 1723 Conn. Acts 292 (preventing the sale of firearms to Indians); 1757–68 Md. Acts 53, ch. 4, § 3 (same); 1763 Pa. Laws 319, § 1 (same); Laws of the Colony of Massachusetts 492 (1769) (same); Statutes of the Mississippi Territory, Indian Intercourse, § 9 (1807) (same); 1844 Mo. Laws 577, ch. 80, § 4 (same); 1853 Or. Laws 257, § 1 (same); Statute Law of the State of Florida, For the Prevention of Indians Roaming at Large Throughout the State, § 1 (1847) (authorizing the seizure of arms from Indians found beyond reservation borders).  For other laws disarming an entire category of persons, see, e.g., 1776 Pa. Laws 11, § 1 (disarming all non-associators, the American colonists who refused to sign militia association charters); 1787 Mass. Acts 555, ch. IV (disarming all persons found guilty of treason or aiding rebellion, even after pardon by the governor and an oath of allegiance); Act of May 5, 1777, ch. 3, 9 Hening's Statutes at Large 281, 281–82 (Virginia law disarming those who refused to give "assurance of Allegiance" during the American Revolution).

[18] As many similarly-situated courts have done, the court "pause[s] to note the challenges created by Bruen's assignment."  Fraser v. Bureau of ATF, 2023 WL 3355339, at *14 n.20 (E.D. Va. May 10, 2023) (quoting United States v. Jackson, 2023 WL 2499856, at *10).  As Judge Payne detailed, "[t]he Court is staffed by lawyers who are neither trained nor experienced in making the nuanced historical analyses called for by Bruen."  Id.  "There is a reason that historians attend years of demanding schooling and that their scholarship undergoes a rigorous peer-review process before publication." Id.  "[H]istory is a vocation itself."  Id.  In fact, other courts have indicated a willingness to appoint an expert witness—namely, a historian—to establish the record regarding the historical tradition of gun ownership in similar cases.  See, e.g., Baird v. Bonta, 2022 WL 17542432, at *9 (E.D. Cal. Dec. 8, 2022) (challenging California state statutes regulating open carry outside of the home); United States v. Bullock, 2022 WL 16649175, at *3 (S.D. Miss. Oct. 27, 2022) (challenging the constitutionality of 18 U.S.C. § 922(g)(1)). Thus, the court proceeds with the historical inquiry as required by Bruen but does so with the disclaimer that although the undersigned was a history major, the court is not staffed by historians.

most basic efforts to improve safety," which included wide-ranging laws "that criminalized menacing behavior with guns (such as brandishing), the firing of weapons in populated areas, . . . [and] firearms access to minors, criminals, and those mentally incompetent." Id. at 82.  For example, during the Massachusetts debate on ratifying the original Constitution, Samuel Adams proposed a bill of rights including a provision stating that Congress could not "prevent the people of the United States, who are peaceable citizens, from keeping their own arms."  The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins 181 (Neil H. Cogan Ed., 1997) (emphasis added). Likewise, the Anti-Federalist minority in the Pennsylvania ratifying convention urged that the Constitution be amended to provide "no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals." Id. at 182; see also id. at 181 (establishing exclusions from the right to arms in the language proposed by the New Hampshire ratifying convention).[19]  Thus, evidence from the early republic suggests that the right to bear arms was meant to allow the government to restrict access to guns for those persons perceived to be dangerous to fellow citizens of the republic.

Looking beyond statements at the ratifying constitutional conventions, early laws contemplated regulations designed to ensure public safety through responsible and safe gun ownership rather than enabling a universal gun-toting free-for-all.  For example, laws

---

[19] These amendments were not ultimately adopted.  Nothing that this court has located within the historical record indicates that their failure to pass was due to the suggested amendments' perceived unconstitutionality.  Rather, it is more likely they failed to garner sufficient support, which, in and of itself, does not mean a provision is unconstitutional.  As such, the court considers the failed amendments to weigh slightly in favor of finding a restriction on gun ownership by persons believed dangerous to be constitutional as originally understood.

established gun registries, required gun training for militia service, and set forth fire codes regulating storage of firearms and gun powder.  Adam Winkler, Heller's Catch-22, 56 UCLA L. Rev. 1551, 1562 (2009).  Moreover, blanket bans on gun ownership applied to "free blacks, slaves, Native Americans, and those of mixed race," as well as persons who "refused to swear loyalty oaths."  Id.  In other words, early politicians found it to be clearly constitutional to regulate gun ownership by persons they perceived to be "dangerous."  Broadly construed, these laws suggest that 18 U.S.C. § 922(g), including § 922(g)(9), is constitutional and merely a modern-day analogue to the long history of laws regulating firearm possession by persons perceived to be "dangerous."

That interpretation accords with the conclusions of other courts.  As now-Justice Amy Coney Barrett explained in her Seventh Circuit dissenting opinion, "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety."  Kanter v. Barr, 919 F.3d 437, 458 (7th Cir. 2019), abrogated by Bruen, 142 S. Ct. 2111 (Barrett, J., dissenting).  She reached this conclusion after providing a detailed analysis of English laws prohibiting possession of firearms by Catholics, based on their presumed untrustworthiness or disloyalty to the Crown, and a summary of American laws both before and after the American Revolution which disarmed slaves and Native Americans.  Id. at 457–58.  Thus, although then-Judge Barrett disagreed with the panel majority's conclusion that even nonviolent felons may categorically "lose their Second Amendment rights solely because of their status as felons," she reasoned that history "does support the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous."  Id. at 464.  Persons convicted of domestic violence in the second degree certainly fall within that ambit.

Finding that the historical evidence generally suggests the constitutionality of 18 U.S.C. § 922(g), the court turns to the specific statutory provision at issue, § 922(g)(9), and the history of laws governing domestic violence.

### 2.  History of Domestic Violence Regulations

Hughes emphasizes that there is little historical evidence of laws regulating firearm possession due to domestic violence, which means that 18 U.S.C. § 922(g)(9) is unconstitutional.  ECF No. 39 at 2 (citing Joseph Blocher, Domestic Violence and the Home-Centric Second Amendment, 27 Duke J. Gender L. & Pol'y 45, 55–56 (2020) ("In the context of domestic violence prohibitions, the historical record is problematic to say the least."); see also Carolyn B. Ramsey, Firearms in the Family, 78 Ohio State L.J. 1257, 1301 (2017) ("Historical support for the exclusion of domestic violence offenders from Second Amendment protection appears rather thin."); Chester, 628 F.3d at 681.  In response, the government emphasizes that "Bruen did not suggest that a statute is unconstitutional simply because it involves a new way to address longstanding concerns"; rather, "history shows that other protections—most notably the common-law surety process—were long available to protect victims of domestic violence."  ECF No. 41 at 10–11.  The government cites surety laws to establish that domestic violence was a concern in the founding era, and that laws designed to restrict the rights of those who committed such abuse and to protect their victims were not viewed as controversial.  In contrast, Hughes rests his argument on the fact that laws exactly analogous to § 922(g)(9) did not exist even though domestic violence existed at the time of the founding.  ECF No. 39 at 2.  The court thus turns to a history of restrictions specifically meant to curtail domestic violence.

To be sure, a narrow reading of Bruen could lead the court to conclude that

§ 922(g)(9) is unconstitutional by emphasizing that the founders had no laws limiting gun

possession by the mentally ill, nor laws denying the right to people convicted of crimes.[20]

Winkler, supra, at 1563.  But this narrow reading undermines the constitutionality

argument of § 922(g)(9) if the court considers only the laws enacted to prevent domestic

violence committed through use of a firearm at the founding.  Such an interpretation is

illogical because it would prevent the court from considering the historical laws in place

to prevent domestic violence merely because they did not explicitly seek to prevent

domestic violence imposed with a gun.  For example, at the founding, judges "were more

likely to confiscate a wife beater's liquor than his guns"; typical colonial punishments for

domestic violence "included whipping and the stocks," and "wife beaters in the 1800s

and early 1900s often served short jail terms, paid substantial fines, or both."  Ramsey,

supra, at 1301.  Indeed, for much of United States history, domestic violence was beyond

the reach of the law.  Blocher, supra, Domestic Violence, at 56 ("The 'right of

chastisement'—of husbands to inflict corporal punishment on their wives—was

recognized in US common law until the mid-1800s.").  Hughes's proposed

characterization misses the mark in part because at the time of the founding, "'[f]amily

and household homicides—most of which were caused by abuse or simple assaults that

got out of control—were committed almost exclusively with weapons that were close at

hand,' which were not loaded guns but rather 'whips, sticks, hoes, shovels, axes, knives,

---

[20] Rather, to exclude felons from the Second Amendment, scholars have offered
two primary originalist arguments. Winkler, supra, at 1563 n.67.  One argument explains
that felons were not part of "the people" mentioned in the Second Amendment.  Id.  The
second argument posits that the Founders understood the right to keep and bear arms to
only extend to "virtuous" citizens.  Id. (citing Reynolds, supra, at 480).

feet, or fists.'"  Blocher & Ruben, <u>supra</u>, at 53 (quoting Randolph Roth, <u>Why Guns Are</u> <u>and Are Not the Problem: The Relationship Between Guns and Homicide in American</u> <u>History, in</u> A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment 117 (Jennifer Tucker, Barton C. Hacker & Margaret Vining eds., 2019)).  In any event, the court has already identified that <u>Bruen</u> counsels the court to construe the "societal problem" broadly, <u>see</u> 142 S. Ct. at 2133, meaning that these penalties could be seen as analogues to § 922(g)(9) and evidence of intent at the founding to govern perceived bad behavior by domestic abusers.

In fact, a slightly broader view encompassing related avenues for relief from domestic abuse—such as the common-law surety process—underscores that analogues existed.  The government explains that "[g]oing back to the English common-law system, spouses could seek protection from abuse and courts could 'bind' a dangerous husband 'with sureties.'"  ECF No. 41 at 11 (quoting <u>King v. Lord Lee</u>, 83 Eng. Rep. 482 (K.B. ca. 1675)).  The Supreme Court explained that "surety statutes" did not impose a substantial burden on public carry analogous to the provision rendered unconstitutional in <u>Bruen</u>.  <u>Bruen</u>, 142 S. Ct. at 2120.  Surety statutes encompass laws "that required certain individuals to post bond before carrying weapons in public," and the Court emphasized that the surety statutes in effect in the late 1700s to early 1800s sought to "prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people."  <u>Id.</u> at 2120, 2145.  It was "intended merely for prevention, without any crime actually committed by the party, but arising only from a probable suspicion, that some crime [was] intended or likely to happen."  4 William Blackstone, <u>Commentaries on the Laws of England</u> 249 (1769).  Blackstone further stated of sureties in general that "[w]ives may demand it

against their husbands; or husbands, if necessary, against their wives." Id. at 251. Unsurprisingly, the surety system was also adopted by colonies in the United States, including South Carolina. See, e.g., State v. Davis, 3 Brev. 3, 4, 5 S.C.L. 3 (S.C. Const. Ct. App. 1811) ("It is clear that a wife may demand sureties of the peace against her husband, and so may her husband against her.") (emphasis omitted); see also Carolyn B. Ramsey, The Stereotyped Offender: Domestic Violence and the Failure of Intervention, 120 Penn. State L. Rev. 337, 344 (2015). One scholar of the period emphasized that "if a justice failed to specify a period the 'recognizance' could even be 'for life.'" Marshall, supra, at 718. Thus, the government's surety statute argument provides the required historical analogue necessary to find § 922(g)(9) constitutional.

Moreover, as the court in Nutter explained, "[l]aws surrounding domestic violence have evolved, in part as women's rights and roles in society expanded." 624 F. Supp. 3d at 641. "The absence of stronger laws may reflect the fact that group most impacted by domestic violence lacked access to political institutions." Id. Or as one Justice of the Ohio Supreme Court recently noted in dissent, "no such analysis [of the United States' historical tradition of firearm regulation] could account for what the United States' historical tradition of firearm regulation would have been if women and nonwhite people had been able to vote for the representatives who determined these regulations." State v. Philpotts, 194 N.E.3d 371, 373 (Ohio 2022) (Brunner, J., dissenting) (emphasis added). The suggestion that only persons convicted of crimes with identical historical analogues may be subject to gun restrictions leads to inappropriately anachronistic results. See Nutter, 624 F. Supp. 3d at 641. Instead, this court considers the broader landscape of gun regulation at the founding in reaching its conclusion on this

prong—to do otherwise misses the forest for the trees. <u>See</u> Christina Mulligan, <u>Diverse Originalism</u>, 21 J. of Const. L. 379 (2018). Thus, the logical application of <u>Bruen</u> tasks the court with evaluating whether historical analogues existed at the founding which restricted gun ownership by identified dangerous persons or that sought to prevent domestic violence. Having considered history and jurisprudence, the court finds that analogues existed sufficient to find 18 U.S.C. § 922(g)(9) constitutional.

## IV.   CONCLUSION

For the reasons set forth above, the court **DENIES** the motion to dismiss.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**June 27, 2023**
**Charleston, South Carolina**